1  **GAUNTLETT & ASSOCIATES**
   David A. Gauntlett (SBN 96399)
2  info@gauntlettlaw.com
   James A. Lowe (SBN 214383)
3  jal@gauntlettlaw.com
   18400 Von Karman, Suite 300
4  Irvine, California 92612
   Telephone:  (949) 553-1010
5  Facsimile:   (949) 553-2050

6  Attorneys for Plaintiff
   Independent Physicians Associates Medical Group, Inc.
7

8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10 INDEPENDENT PHYSICIANS          ) Case No.:
   ASSOCIATES MEDICAL GROUP,       )
11 INC, d/b/a ALLCARE IPA, A California )
   corporation,                    )
12                                 )
                Plaintiff,         )
13                                 ) **COMPLAINT FOR:**
          vs.                      )
14                                 ) **(1) DECLARATORY RELIEF ON**
                                   )     **DEFENDANT'S DUTY TO**
15 IRONSHORE SPECIALTY             )     **DEFEND**
   INSURANCE COMPANY, An Arizona   ) **(2) BREACH OF CONTRACT**
16 corporation,                    ) **(3) BREACH OF COVENANT OF**
                                   )     **GOOD FAITH AND FAIR**
17              Defendant.         )     **DEALING**
                                   )
18                                 ) **JURY TRIAL DEMANDED**
                                   )
19 _____ )

20

21

22

23

24

25

26

27

28

1.     In this insurance coverage suit, Plaintiff Independent Physicians Associates Medical Group, Inc, d/b/a AllCare IPA ("AllCare" or "Plaintiff"), seeks: **(i)** a judicial declaration that Defendant IronShore Specialty Insurance Company. ("IronShore" or "Defendant") has a duty to defend Plaintiff in two underlying actions: The first is styled as *Central Valley Medical Group, Inc., v. Independent Physicians Associates Medical Group, Inc,* Superior Court, Stanislaus County, California, Case No. CV-19-001652 (the "*CVMG Action*") and the second is styled as *Dameron Hospital v. Independent Physicians Associates Medical Group, Inc,* Superior Court, San Joaquin County, California, Case No. STK-CV-UBC-21019-13963 (the "*Dameron Action*"); **(ii)** a judicial declaration that IronShore must reimburse AllCare for all reasonable defense expenses it has incurred and will incur in the *CVMG Action* and the *Dameron Action*, plus prejudgment interest at the applicable rate from the date of each invoice; **(iii)** a judicial declaration that IronShore has breached its insurance contracts with AllCare; **(iv)** a judicial declaration that IronShore has breached its covenant of good faith and fair dealing; **(v)** damages from IronShore for its breaches of contract; and **(vi)** damages from IronShore for its breach of the covenant of good faith and fair dealing.

## THE PARTIES

2.     Plaintiff AllCare is a California corporation with its principal place of business in Modesto, California.

3.     On information and belief, Defendant Ironshore Specialty Insurance Company. is an Arizona corporation with its principal place of business in New York, New York.

## JURISDICTION

4.     This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that complete diversity exists between the parties, as the Plaintiff is a citizen of California and the Defendant is a citizen of Arizona and New York, for purposes of

diversity jurisdiction.

6. The amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs. In addition to other and further relief, declaratory relief is sought.

7. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the contract and covenant of good faith and fair dealing claims.

VENUE

8. Venue is proper in the United States District Court for the Eastern District of California pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim alleged herein occurred in this District.

9. On information and belief, IronShore is an insurance company actively selling insurance policies in California, including the Eastern District of California.

10. IronShore sold the insurance policies at issue in this case to AllCare, a business located in the Eastern District of California where the policy was received.

11. The IronShore policies at issue were intended to cover AllCare's business operations throughout California, including the Eastern District of California, as well as throughout the United States.

12. The alleged wrongful conduct described in the pleadings in the *CVMG Action* and in the *Dameron Action* purportedly occurred within the Eastern District of California.

13. Part of the performance required under the IronShore policies at issue, including, without limitation, defense of the two underlying actions and the incurring and payment for attorneys' defense fees, occurs within the Eastern District of California, as work done by the insured's defense team is occurring in Stanislaus County and San Joaquin County, California, within the Eastern District of California.

**THE IRONSHORE POLICIES**

*IronShore's E&O Policy*

14. IronShore sold Managed Care Errors and Omissions Liability Policy No.

002386603 to the Insured Entity, Independent Physicians Associates Medical Group, Inc. dba Allcare IPA, for the Policy Period May 22, 2018 to May 22, 2019 and renewed it as Policy No. 002386604 for the Policy Period May 22, 2019 to May 22, 2020 (the "E&O Policy"). A copy of **the E&O Policy** is attached here as **Exhibit "1"**.

15.     IronShore's E&O Policy's Insuring Agreement for Managed Care Errors and Omissions Insurance provides, in pertinent part, as follows:

> The Underwriter will pay on behalf of the **Insured**[1] any **Loss** which the **Insured** is legally obligated to pay as a result of any **Claim** that is first made against the **Insured** during the **Policy Period** and reported to the Underwriter either during the Policy Period or in any event within ninety (90) days after the end of the **Policy Period**, in accordance with CONDITION (B) of this Policy. As part of and subject to the Limits of Liability stated in ITEM 3(a) of the Declarations, the Underwriter will have the right and duty to defend any **Claim** made against the **Insured** which is covered by this Policy, even if the allegations of such **Claim** are groundless, false or fraudulent.

[**Exhibit "1"** § I. A].

16.     The E&O Policy's applicable limit of insurance for the "Managed Care Errors and Omissions Insurance" is $2,000,000 for each Claim or Related Claim with an aggregate of $4,000,000. [**Exhibit "1"** Policy Declarations, III. a.]

17.     The Policy includes the following pertinent Definitions:

> "**Claim**" means any written notice received by any **Insured** that a person or entity … intends to hold an Insured responsible for a **Wrongful Act** which was committed or allegedly committed on or after the Retroactive Date listed in ITEM 7 of the Declarations. In clarification and not in limitation of the foregoing, such notice may be in the form of an arbitration, mediation, judicial, declaratory or injunctive proceeding. A **Claim** will be deemed to be made when such written notice is first received by the President, Chief Executive Officer, Chief Financial Officer, member of the legal department, or member of the risk management department of the **Insured**.
>
> * * *
>
> "**Defense Expenses**" means reasonable legal fees and expenses incurred in the investigation, adjustment, defense or appeal of a Claim; provided, that Defense Expenses shall

---

[1] Bolded terms in the Policy are defined terms.

not include remuneration, salaries, overhead, fees or benefit expenses of any **Insured**.

\* \* \*

"**Insured**" means any **Insured Entity** and any **Insured Person.**

\* \* \*

"**Loss**" means any … **Defense Expenses** and any monetary amount which an Insured is legally obligated to pay as a result of a **Claim**.…

\* \* \*

"**Managed Care Service**" means any services or activities performed in the administration or management of health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, automobile medical payment, or workers' compensation plans, whether provided on paper, in person, electronically, or in any other form and whether performed on behalf of the **Insured** or by the **Insured** for itself or on behalf of any other party for a fee.

\* \* \*

"**Wrongful Act**" means:

(1) any actual or alleged act, error or omission in the performance of, or any failure to perform, a **Managed Care Service** by any **Insured Entity**.…

[**Exhibit "1"** § II Definitions]

18.     The E&O Policy establishes a Retroactive Date of January 1, 1993 as the date from which the E&O Policy provides coverage for wrongful acts.

[**Exhibit "1"** Declarations Item 7]

19.     The Policy includes the following pertinent exclusion (as identified by IronShore):

Except for Defense Expenses, the Underwriter shall not pay Loss from any Claim brought about or contributed to by:

(1) any willful misconduct or willfully dishonest, fraudulent, criminal or malicious act, error or omission by any Insured;

(2) any willful violation by any Insured of any law, statute, ordinance, rule or regulation; or

(3)  any  Insured  gaining  any  profit,  remuneration  or

advantage to which such Insured was not legally entitled.

For the purposes of determining the applicability of this EXCLUSION (A), no Wrongful Act of any Insured shall be imputed to any other Insured. Determination of the applicability of this EXCLUSION (A) may be made by an admission or by a final adjudication in a proceeding constituting the Claim, or in a proceeding separate from or collateral to any proceeding constituting the Claim.

[**Exhibit "1"** § III Exclusions]

*IronShore's D&O Policy*

20.    IronShore sold Managed Care Organizations Directors and Officers Liability Policy No. 002386703 to the Insured Entity, Independent Physicians Associates Medical Group, Inc. dba Allcare IPA, for the Policy Period May 22, 2018 to May 22, 2019 and renewed it as Policy No. 002386704 for the Policy Period May 22, 2019 to May 22, 2020 (the "D&O Policy"). A copy of **the D&O Policy** is attached here as **Exhibit "2"**.

21.    IronShore's D&O Policy's Insuring Agreement for Managed Care Organizations Directors and Officers Liability Policy provides, in pertinent part, as follows:

On behalf of the **Insured Entity**, the Underwriter will pay **Loss** from **Claims** first made during the **Policy Period** against the **Insured Entity** for Wrongful Acts and reported to the Underwriter either during the **Policy Period** or in any event within sixty (60) days after the end of **the Policy Period**....

[**Exhibit "2"** § I. C].

22.    The **Insured Entity** is Independent Physicians Medical Group, Inc. dba AllCare.

[**Exhibit "2"** Endorsement 3].

23.    The E&O Policy's applicable limit of insurance for the "Managed Care Organizations Directors and Officers Liability Policy" is $2,000,000 for each Claim or Related Claim with an aggregate of $4,000,000.

[**Exhibit "2"** Policy Declarations, III]

24.    The Policy includes the following pertinent Definitions:

"**Claim**" means:

(1) any written demand for monetary, non-monetary or injunctive relief;

(2) any civil proceeding in a court of law or equity, including any appeal therefrom, which is commenced by the filing of a complaint, motion for judgment or similar proceeding ….

[**Exhibit "2"** § II B]

"**Defense Expenses**" means reasonable and necessary legal fees and expenses incurred in the defense or appeal of a **Claim**…..

[**Exhibit "2"** § II D]

"**Loss**" means **Defense Expenses** and any monetary amount which an Insured is legally obligated to pay as a result of any **Claim**….

[**Exhibit "2"** § II L]

"**Wrongful Act**" means:

(1) any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by any **Insured Entity** ….

[**Exhibit "2"** § II Y]

25.    The D&O Policy includes the following pertinent exclusion (as identified by IronShore):

This Policy does not apply to, and no coverage will be available under this Policy for:

(A) **Loss,** other than **Defense Expenses**, which any **Insured** is obligated to pay:

(1) from any **Claim**…

(b) against any **Insured** brought about or contributed to in fact by the gaining by any **Insured** of any profit, remuneration or advantage to which such Insured is not legally entitled….

[**Exhibit "2"** § II A. 1. b]

**Loss**, including **Defense Expenses**, from any Claim:

(4) for any actual or alleged liability of any **Insured Entity** under any express contract or agreement, unless such liability would have attached to such **Insured Entity** in the

absence of such express contract or agreement. For purposes of this EXCLUSION (D)(4), an "express contract or agreement" is an actual agreement between or among the contracting parties, the terms of which are openly stated in distinct and explicit language, either orally or in writing, at the time of its making;

[**Exhibit "2"** § II D. 4]

## THE UNDERLYING *CVMG ACTION*

26.     On March 19, 2019, claimant Central Valley Medical Group, Inc.("CVMG") filed its complaint ("CVMG Complaint") against Plaintiff Independent Physicians Medical Group, Inc. dba AllCare ("AllCare") in the action styled as *Central Valley Medical Group, Inc. v. Independent Physicians Medical Group, Inc. dba AllCare*, in the Stanislaus County California Superior Court, Case No. CV 19-1652 (the "*CVMG Action*"). A copy of the original CVMG Complaint is incorporated herein and attached as **Exhibit "3."**

27.     On August 6, 2019 claimant CVMG filed a First Amended Complaint ("FAC") in the *CVMG Action* in the Stanislaus County California Superior Court. A copy of CVMG's FAC is incorporated herein and attached as **Exhibit "4."**

28.     On December 4, 2019 claimant CVMG filed a Second Amended Complaint ("SAC") in the *CVMG Action* in the Stanislaus County California Superior Court. A copy of CVMG's (redacted, publically filed) SAC is incorporated herein and attached as **Exhibit "5."**

29.     The CVMG Complaints allege a Claim against AllCare under IronShore's E&O policy. They make pertinent allegations of acts, errors or omissions in the performance of, or any failure to perform, a Managed Care Service, allegedly committed on or after the Retroactive Date of January 1, 1993, that create a potential for coverage under the IronShore's E&O policy, thereby triggering IronShore's defense obligation.

30.     CVMG's SAC made the following allegations, among others, against AllCare:

¶ 6     [I]n   the   case   of   ALLCARE's   soon-to   sunset   contractual

relationship with CareMore Health Plan, ALLCARE sent inaccurate and misleading communications to members to lure them away from their existing health plan (which as described below harmed and will continue to harm CVMG).

¶ 17   Through its contract with Sutter, CVMG currently is contracted with the following insurance plans: Aetna Health of California Inc.; Cigna HealthCare of California, Inc.; Health Net of California, Inc.; and UHC of California. As described below, because of ALLCARE's improper conduct, Sutter has elected to terminate its relationship with CVMG, effective January 1, 2020 and thus going forward, CVMG will not be contracted with the health plans identified in this paragraph.

ALLCARE "Misled Members into Switching Health Plans"

¶ 21   As of late 2018, ALLCARE and CVMG were the only two IPAs in Stanislaus County with physician networks sufficient to serve CareMore's 4,500 Medicare Members. ALLCARE was aware in late 2018 that CVMG was the only other IPA in Stanislaus County with a sufficient physician network to serve CareMore's members. ALLCARE was aware that throughout 2019, CVMG was the only other IPA in Stanislaus County with a sufficient physician network to serve CareMore's members.

¶ 25   During Open Enrollment, ALLCARE prepared and sent letters to approximately 3,000 CareMore members, which letters were sent on the letterhead of ALLCARE contracted physicians ("Plan Switch Letters"). ALLCARE sent these Plan Switch Letters to the CareMore members by U.S. Mail, overnight mail and/or certified mail, and some members received more than one copy of the same Plan Switch Letter by different delivery methods.

¶ 26   ALLCARE's Plan Switch Letters informed the CareMore members that "[t]his is an important message about possible changes to your health plan." The Plan Switch Letters notified CareMore members that "[i]n the foreseeable future I [the member's physician] may no longer be contracted with CareMore Health Plan through AllCare, and may not be able to care for you under your CareMore Plan" and that "I take your care and selection of Medicare Advantage health plans seriously and want you to have all the information available to ensure continued access to me as your Primary Care Physician." The Plan Switch Letters suggested that the member contact HealthMarkets to "help you compare your Medicare Advantage health plan options and to keep me as your physician."

¶ 27   The Plan Switch Letters do not provide a date by which CareMore is no longer contracted with ALLCARE, contrary to the requirements of Health and Safety Code § 1373.65; 28 Cal. Code of Reg. § 1300.67.1.3; Department of Health Care Services All Plan Letter 16-001. The Plan Switch Letters do not inform the members that the contract between ALLCARE and CareMore is in force until December 31, 2019, more than a year after the Plan Switch Letters were sent. Because the Plan Switch Letters contain language implying urgency and serious concern, were sent in a manner communicating seriousness and urgency (overnight mail/certified mail) and do not provide a date by which CareMore will no longer be contracted with ALLCARE, the Plan Switch

Letters created a false impression that members needed to make an immediate change before the end of Open Enrollment on December 7, 2018.

¶ 28   The Plan Switch Letters did not include "the following statement in not less than 8-point type:

'If you have been receiving care from a health care provider, you may have a right to keep your provider for a designated time period. Please contact your HMO's customer service department, and if you have further questions, you are encouraged to contact the Department of Managed Health Care, which protects HMO consumers, by telephone at its toll-free number, 1-888-HMO-2219, or at a TDD number for the deaf or hard of hearing at 1-877-688-9891, or online at www.hmohelp.ca.gov.'"

California Health and Safety Code section 1673.65(f) requires that "[a] health care service plan and a provider...include [the above language] in all written, printed, or electronic communications sent to an enrollee that concern the contract termination or block transfer" of patients.

¶ 29   These Plan Switch Letters to patients were inaccurate and misleading, and inconsistent with statutory requirements for communications with Medicare health plan members.

¶ 31   ALLCARE sent the Plan Switch Letters with the intention of inducing patients covered by CareMore to switch health plans away from CareMore (and by extension away from CVMG).

¶ 32   ALLCARE intended for the patients receiving the Plan Switch Letters to rely upon the Plan Switch Letters to alter their choice of health plan during the open enrollment period for 2018 so as to continue to receive treatment from their primary care physician. ALLCARE intended for the patients to have a mistaken impression that they were in imminent danger of losing their doctors unless they transferred from CareMore to another HMO.

ALLCARE Scheme [to] Destroy CVMG's Existing Business"

¶ 38   On or about ███████████,[2] ALLCARE paid its physicians their annual contractual performance bonuses for their performance ███████████████████████████████████████████████ ███████████████████████████████████████████████ █████████.

¶ 39   Beginning on or about February 20, 2019, Defendant ALLCARE, through its agents and officers including its Chief Executive Officer,

_____

[2] Portions of the Second Amended Complaint have been Redacted from Public Version. The terms of the Protective Order in the CVMG suit do not permit AllCare's insurers to have access to sealed documents. However, the redacted portions of the Second Amended Complaint concern only financial details about the physicians' contracts that are referenced therein. That level of detail in the allegations is unlikely to affect a duty to defend analysis.

Matthew Coury, and its President and Chairman of the Board, Randy Winter, told physicians who were affiliated with both Defendant and CVMG that Defendant would withhold any further annual contractual performance bonuses unless the physicians terminated their CMVG contracts.

¶ 40   ALLCARE dressed up this part of its scheme in colorful language, referring to it as the Preferred Physician Quality Incentive Program ("PPQI"). To be eligible for the PPQI, physicians could not contract with any other IPA in Stanislaus County that holds one or more of the same HMO contracts as ALLCARE. ALLCARE referred to this requirement as the prerequisite (referred to herein as the "Exclusivity Prerequisite"). ALLCARE told physicians that, unless they gave notice of termination of their contract with CVMG within 60 days, they would lose their performance bonuses.

¶41.   ALLCARE's goal was for 100% of ALLCARE's physicians to terminate their contract with CVMG, decimating CVMG's network and destroying CVMG's business. In this way, ALLCARE would divert membership from CVMG by making sure that patients had no choice but to see their PCP through ALLCARE.

¶42.   ALLCARE's Exclusivity Prerequisite was intended to, and in fact, did, put significant financial pressure on PCPs. ██████████████████████████████████████████████████████ This loss of compensation was significant for all of these physicians.

¶43.   The only IPA in Stanislaus County impacted by this policy was CVMG. This was known to ALLCARE when it developed and announced the Exclusivity Prerequisite. As such, the Exclusivity Prerequisite targeted CVMG only.

¶44.   Thus, any physician who failed to terminate her contract with CVMG would lose her annual contractual performance bonus ██████████████████.

¶46.   … ALLCARE has communicated to its physicians that ALLCARE will penalize non-exclusive CVMG-contracted physicians by refusing to pay the contractually mandated performance bonuses. Non-exclusive CVMG-contracted physicians will not be paid for meeting their performance targets in breach of ALLCARE's contract with the physicians.

¶47.   ALLCARE also promised to divert funds earned by physicians (as a result of patients assigned to those physicians through ALLCARE) who remain contracted with CVMG to those physicians who terminate their contracts with CVMG. Thus, the "exclusive" physicians will receive funds earned by the non-exclusive physicians.

¶48.   ….Physicians were pressured by ALLCARE and its agents to terminate their contracts with CVMG and had a resulting fear that their livelihoods were at risk if they opted not to terminate their contracts with CVMG.

¶49.   To further its scheme, ALLCARE and/or its agents also disparaged

and defamed CVMG by communicating to physicians and medical providers that CVMG would no longer be in existence as of July 2019. ALLCARE also communicated to physicians and medical providers that CVMG did not pay bonuses to physicians in 2018 and that this failure to pay bonuses was evidence that CVMG's business was not doing well. These statements were inaccurate and contrary to the reason for CVMG's decision related to bonuses.

ALLCARE Scheme [to] Destroy CVMG's Prospective Business"

¶52.   … ALLCARE has now focused its efforts on destroying the upcoming CareMore contract. For instance, as a result of ALLCARE's assault on CVMG's PCP Network, CVMG's network recently was deemed inadequate to serve CareMore's members (even though it had been determined adequate previously). ALLCARE's improper conduct decimated CVMG's network, directly leading to the "inadequate" designation. ████████████████████████████████████████

¶53.   …. It is critical for CVMG's business that it be able to retain and attract physicians to its network. Should its network become inadequate, it is at risk for losing the CareMore contract, upon which CVMG's business now depends. ALLCARE continues to take actions to interfere with CVMG's relationships with physicians and members, in an effort to destroy CVMG's network and its business.

¶54.   …. Because CVMG understood that ALLCARE's contracts with its PCPs allow those physicians to contract with other IPAs for members with health plans with whom ALLCARE was not contracted (e.g. a non-overlapping health plan), CVMG contacted PCPs requesting that they contract with CVMG for the CareMore business only…. CVMG sent these physicians correspondence inviting them to contract with CVMG for CareMore only….

¶55.   Most physicians declined CVMG's offer because they believed that ALLCARE's Exclusivity Prerequisite prevented them from contracting with CVMG. In other words, these physicians refused to contract with CVMG as a direct result of ALLCARE'S wrongful conduct, which led physicians to believe that they would lose their contractual bonuses. Although a few physicians agreed to contract with CVMG for CareMore only, those physicians ultimately backed out of their decision after additional contact from an ALLCARE representative who told them ALLCARE would withhold the bonuses if they contracted with CVMG.

¶56.   …. ALLCARE's intentional misrepresentation, deceit and/or concealment of the nature of its contract with physicians was intended to deprive CareMore and CVMG of members and to otherwise cause injury to CareMore and CVMG. ALLCARE knew that such intentional misrepresentation, deceit and/or concealment of the nature of its contract with physicians would or was likely to disrupt patient-physician relationships and cause ALLCARE-contracted physicians to lose members. ALLCARE sought to "make up" for any such losses to physicians by redirecting funds earned by CVMG-contracted physicians to the now-exclusive physicians who had terminated their contracts with

CVMG.

¶62.  …. ALLCARE's actions have prevented those physicians from retaining their relationship with those patients and prevented those patients from retaining their relationship with those physicians. ALLCARE has done this by communicating to physicians that the Exclusivity Prerequisite prevents physicians from contracting with CVMG at all, including for CareMore only. This is contrary to the express contractual language in ALLCARE's contracts with physicians. ALLCARE's actions will cause unnecessary disruptions in patient/physician relationships.

¶63.  ALLCARE's scheme is not limited to pressuring the PCPs. Specifically, ALLCARE has also targeted the patients…. [C]ommunications were intended to induce the members to terminate their relationship with CVMG in order to retain their relationship with their physician. ALLCARE participated in and/or was aware of communications to members related to the termination of the physician's relationship with CVMG and intended that such communications would induce members to terminate their relationship with CVMG in order to retain access to their physician. In fact, "form" communications from physicians in various practices to their CareMore members were sent to those members as recently as October 2019. ALLCARE was aware of and/or participated in these communications to CareMore members.

¶65.  ALLCARE's actions have caused, and will continue to cause, CVMG to suffer significant harm.

¶¶ 66-79 By Loss of PCPs, Loss of Members, Network Adequacy, Loss of potential HMO contracts, Loss of Existing HMO contracts, Harm to the CareMore Contract, and Harm To Healthcare Consumers.

¶84.  As a separate and independent wrongful act,2 Defendant's threat to refuse to pay earned annual contractual performance bonuses to physicians in the future unless they terminate their contracts with CVMG, while still demanding but not paying for the same performance, is a breach of Defendant's contract(s) with those physicians, a breach of the implied covenant of good faith and fair dealing inherent in that contract, and/or violation of California law (including placing an undue burden on trade).3 ALLCARE's conduct is coercive in light of the actual and/or perceived severe harm those physicians would suffer if they refused ALLCARE's demand, including but not limited to impacts to their livelihood and personal and business finances, impacts to the livelihoods of their staff, and the professional cost involved in severing relationships with patients who are contracted with CVMG. As alleged above, ALLCARE further interfered with CVMG's contracts and relationships by making defamatory statements about CVMG to physicians.

ALLCARE and/or its agents also disparaged and defamed CVMG by communicating to physicians that CVMG would no longer be in existence as of July 2019.

¶96.  As a separate and independent wrongful act, Defendant's threat to refuse to pay earned annual contractual performance bonuses to physicians in the future unless they terminate their contracts with

CVMG, while still demanding but not paying for the same performance, is an illegal restraint in trade, a breach of Defendant's contract(s) with those physicians and/or a breach of the implied covenant of good faith and fair dealing inherent in that contract. ALLCARE's conduct is coercive in light of the actual and/or perceived severe harm those physicians would suffer if they refused ALLCARE's demand, including but not limited to impacts to their livelihood and personal and business finances, impacts to the livelihoods of their staff, and the professional cost involved in severing relationships with patients who are contracted with CVMG. As alleged above, ALLCARE further interfered with CVMG's contracts and relationships by making defamatory statements about CVMG to physicians.

¶122. As a separate and independent wrongful act, Defendant's threat to refuse to pay earned annual contractual performance bonuses to physicians in the future unless they terminate their contracts with CVMG, while still demanding but not paying for the same performance, is an unlawful restraint in trade, a breach of Defendant's contract(s) with those physicians and/or a breach of the implied covenant of good faith and fair dealing inherent in that contract. ALLCARE's conduct is coercive in light of the actual and/or perceived severe harm those physicians would suffer if they refused ALLCARE's demand, including but not limited to impacts to their livelihood and personal and business finances, impacts to the livelihoods of their staff, and the professional cost involved in severing relationships with patients who are contracted with CVMG. As alleged above, ALLCARE further interfered with CVMG's contracts and relationships by making defamatory statements about CVMG to physicians.

¶199. Here, ALLCARE's Exclusivity Prerequisite prevents physicians from freely engaging in their lawful profession as physicians. ALLCARE's policy penalizes physicians who contract with CVMG, refusing to pay those physicians their contractual performance bonuses unless they terminate their contracts with CVMG. The contractual performance bonus owed by ALLCARE to these physicians ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ ALLCARE's policy functions as a penalty for physicians who choose to contract with CVMG and withholds compensation from those physicians ██████████████████████████████ ████████████████████████

¶200. Furthermore, ALLCARE's threats to withhold contractual performance bonuses from physicians who contract with CVMG has prevented physicians who desire to contract with CVMG from entering into and/or maintaining those contracts.

¶201. These threats restrain physicians from "engaging in [their] lawful profession, trade, or business" in contravention of Section 16600.

¶206. As a direct and proximate result of Defendant's conduct as alleged herein, CVMG has lost all its existing contracts with health plans.

[**Exhibit "5"**].

31.   CVMG seeks and has sought monetary damages from AllCare for its various allegedly wrongful acts.

## TENDER OF *CVMG ACTION* TO IRONSHORE AND ITS ACKNOWLEDGMENT OF POTENTIAL COVERAGE REQUIRING DEFENSE BY INDEPENDENT COUNSEL

32.   AllCare requested a defense of the *CVMG Action* from IronShore on or about August 27, 2019 when it provided a copy of CVMG's FAC to IronShore.

33.   IronShore initially denied AllCare's request for defense of the *CVMG Action* on November 29, 2017.

34.   AllCare provided IronShore with a copy of CVMG's SAC on December 19, 2019.

35.   IronShore finally acknowledged its duty to defend the *CVMG Action,* subject to a reservation of rights, on February 5, 2020. A copy of that letter is attached as **Exhibit "6"**.

36.   IronShore agreed in its February 5, 2020 reservation of rights letter that "[b]ased on CVMG's allegations that [AllCare's] Patient Switch Letter failed to include certain statements required by the California Health and Safety Code section 1373.65 the FAC and the SAC potentially constitute Claims for Wrongful Acts under the policy." "on the Internet during the period of the [Policy]." [**Exhibit "6"** p. 5].

37.   IronShore's February 5, 2020 letter further agreed that "[p]ursuant to Insuring Agreement A of the policy, IronShore has the right and duty to defend any Claim against the Insured [but] in light of IronShore's reservation of rights, pursuant to California Civil Code section 2860(A), AllCare has the right to select independent counsel to defend this matter."

[**Exhibit "6"** p. 9].

## THE UNDERLYING *DAMERON ACTION*

38.   On October 21, 2019, claimant Dameron Hospital filed its complaint ("Dameron Complaint") against Plaintiff Independent Physicians Medical Group, Inc.

dba AllCare in the action styled *as Dameron Hospital v. Independent Physicians Medical Group, Inc. dba AllCare IPA, et al*. in the San Joaquin County California Superior Court, Case No. STK-CV-UBC-2019-13963 (the "*Dameron Action*"). A copy of the Dameron Complaint is incorporated herein and attached as **Exhibit "7."**

39.    The Dameron Complaint alleges a Claim against AllCare under IronShore's D&O policy. It makes pertinent allegations of acts, errors, omissions, misstatements, misleading statements or breaches of duty by AllCare, the Insured Entity, allegedly committed during the Policy Period, that create a potential for coverage under the IronShore's D&O policy, thereby triggering IronShore's defense obligation.

40.    Dameron's Complaint made the following allegations, among others, against AllCare:

The Complaint alleges that in 2017, the Plaintiff Hospital, Alignment Health Plan and AllCare entered into a risk pool arrangement whereby the entities coordinated care provided to Alignment's members who were seen by AllCare's physicians.

The Complaint alleges that Alignment, a Medicare Advantage Plan, received monthly capitation payments from the Centers for Medicare and Medicaid Services ("CMS") for every member.

Under its agreement with CMS, Alignment arranged for the provision and payment of medical services for its members and used the capitation funds it received from CMS to pay for their medical services. Alignment would also direct a percentage of the capitation funds it received from CMS into a Risk Pool Fund.

The Plaintiff Hospital and AllCare shared the risk for the services provided to Alignment's members but were able to control the utilization and cost of the services in an effort to generate a surplus in the Risk Fund. In the event of a surplus, the Plaintiff was required to pay 45% of the surplus to Alignment.

The Plaintiff alleges that to control the costs and utilization of care, it was necessary for AllCare physicians to admit their patients (and Alignment members) to the Plaintiff Hospital as needed; admissions to other hospitals required prior approval from the Plaintiff's Case Manager.

The Plaintiff alleges that AllCare did not admit their patients

to the Plaintiff Hospital as the primary hospital. Rather, AllCare admitted patients to competitor hospitals without the authorization from the Plaintiff's Case Manager.

The Complaint alleges that AllCare knew that by admitting its patients to other hospitals, the funds in the Risk Pool would be diverted away from the Plaintiff Hospital and used to pay the competitor hospitals.

The Complaint alleges that AllCare refused to send its patients to the Plaintiff Hospital and refused to coordinate care with the Plaintiff, which negatively impacted the Risk Pool. As a result, the Risk Pool Funds for 2017 and 2018 resulted in deficits.

[**Exhibit "7"**]

41.     Dameron seeks and has sought monetary damages from AllCare for its various allegedly wrongful acts.

## TENDER OF *DAMERON ACTION* TO IRONSHORE AND ITS ACKNOWLEDGMENT OF POTENTIAL COVERAGE REQUIRING DEFENSE BY INDEPENDENT COUNSEL

42.     AllCare promptly requested a defense of the *Dameron Action* from IronShore on and provided a copy of Dameron's Complaint to IronShore.

43.     IronShore acknowledged its duty to defend the *Dameron Action* and sent AllCare a reservation of rights letter on January 2, 2020. A copy of that letter is attached as **Exhibit "8."**

44.      IronShore agreed in its January 2, 2020 reservation of rights letter that "[t]he Complaint alleges an act, error, omission, misstatement, misleading statement or breach of duty by the Insured Entity, and so has the potential to trigger coverage under the D&O Policy." [**Exhibit "8"** p. 4].

45.     IronShore further agreed "that in light of Ironshore's reservation of rights, pursuant to California Civil Code § 2860(a), AllCare has the right to select independent counsel to defend this matter." [**Exhibit "8"** p. 5].

1

2

**IRONSHORE'S BREACH –**

**FAILURE TO PAY FOR DEFENSE FEES**

3    46.    AllCare has retained the services of Kessenick Gamma & Free, LLP

4    ("KGF") as defense counsel in both the *CVMG* and *Dameron Actions* because KGF

5    has strong medical litigation experience and is familiar with AllCare and AllCare's

6    industry.

7    47.    Although IronShore has agreed that it has a defense obligation for both

8    the *CVMG* and *Dameron Actions* and that AllCare has a right to independent defense

9    counsel that it will pay in both the *CVMG* and *Dameron Actions,* IronShore has

10    entirely failed to make any payments of defense invoices. All defense invoices for the

11    periods after the tender of defense in the two cases have been sent to IronShore but

12    IronShore has failed to make any payments of defense expenses in the two cases.

13    48.    AllCare has repeatedly asked for payment of defense expenses incurred

14    in the defense of the *CVMG* and *Dameron Actions* and although IronShore has

15    claimed that it is "defending" the actions, IronShore has failed and refused to pay any

16    defense expenses as it has repeatedly promised to do. It has not defended AllCare.

17

**FIRST CAUSE OF ACTION**

18

**Declaratory Relief – Duty to Defend**

19    49.    Plaintiff, by this reference, incorporates each and every allegation set

20    forth in the above paragraphs of this Complaint as though fully alleged herein.

21    50.    Valid contracts exist between AllCare and IronShore, namely, the

22    Policies.

23    51.    AllCare has fully performed all of the obligations and conditions to be

24    performed by it under the Policies and has paid premiums owed under the Policies

25    each month the Policies have been in force.

26    52.    By issuing and delivering the Policies and taking payments from AllCare,

27    IronShore agreed to provide a defense for suit seeking damages for "wrongful acts" as

28    defined in the Policies.

258445_7.doc

COMPLAINT

53.     The *CVMG Action* alleges facts implicating coverage under the E&O Policy as "wrongful acts," thereby triggering IronShore's obligation to defend its insured, AllCare, in the *CVMG Action*.

54.     The *Dameron Action* alleges facts implicating coverage under the D&O Policy as "wrongful acts," thereby triggering IronShore's obligation to defend its insured, AllCare, in the *Dameron Action*.

55.     No exclusions would bar IronShore from defending AllCare in the *CVMG Action*.

56.     No exclusions would bar IronShore from defending AllCare in the *Dameron Action*.

57.     IronShore has acknowledged the potential for coverage in its reservation of rights letter and also expressly acknowledged that it has an obligation to defend AllCare in the *CVMG Action* by paying the reasonable expenses of independent defense counsel.

58.     IronShore has acknowledged the potential for coverage in its reservation of rights letter and also expressly acknowledged that it has an obligation to defend AllCare in the *Dameron Action* by paying the reasonable expenses of independent defense counsel.

59.     IronShore is obligated under the E&O Policy to pay attorneys' fees, costs, and other expenses that its insured, AllCare, incurs in the defense of the *CVMG Action*.

60.     IronShore is obligated under the D&O Policy to pay attorneys' fees, costs, and other expenses that its insured, AllCare, incurs in the defense of the *Dameron Action*

61.     IronShore's duty and obligation to defend AllCare in the *CVMG Action* further includes the duty to reimburse Plaintiff for all the defense expenses it incurs in the *CVMG Action*.

62.     IronShore's duty and obligation to defend AllCare in the *CVMG Action*

further includes the duty to reimburse Plaintiff for all the defense expenses it incurs in the *Dameron Action*.

63.    IronShore has not paid any of KGF's defense invoices since the dates of tender.

64.    An actual bona fide controversy exists between AllCare and IronShore that requires judicial declaration by this Court of the parties' rights and duties regarding the IronShore's duty to defend AllCare in the *CVMG Action*, the amount of defense expenses owed by IronShore, and IronShore's duty to timely pay defense fees and costs.

## SECOND CAUSE OF ACTION

### Breach Of Contract

65.    Plaintiff, by this reference, incorporates each and every allegation set forth in the above paragraphs of this Complaint as though fully alleged herein.

66.    Valid contracts exist between AllCare and IronShore, namely, the Policies.

67.    AllCare has fully performed all of the obligations and conditions to be performed by it under the Policies and has paid premiums owed under the Policies each month the Policies have been in force.

68.    By issuing and delivering the Policies and taking payments from AllCare, IronShore agreed to provide a defense for suit seeking damages for "wrongful acts" as defined in the Policies.

69.    The *CVMG Action* alleges facts implicating coverage under the E&O Policy as "wrongful acts," thereby triggering IronShore's obligation to defend its insured, AllCare, in the *CVMG Action*.

70.    The *Dameron Action* alleges facts implicating coverage under the D&O Policy as "wrongful acts," thereby triggering IronShore's obligation to defend its insured, AllCare, in the *Dameron Action*.

71.    No exclusions would bar IronShore from defending AllCare in the

*CVMG Action.*

72.    No exclusions would bar IronShore from defending AllCare in the *Dameron Action*.

73.    IronShore has acknowledged the potential for coverage in its reservation of rights letter and also expressly acknowledged that it has an obligation to defend AllCare in the *CVMG Action* by paying the reasonable expenses of independent defense counsel.

74.    IronShore has acknowledged the potential for coverage in its reservation of rights letter and also expressly acknowledged that it has an obligation to defend AllCare in the *Dameron Action* by paying the reasonable expenses of independent defense counsel.

75.    IronShore is obligated under the E&O Policy to pay attorneys' fees, costs, and other expenses that its insured, AllCare, incurs in the defense of the *CVMG Action*.

76.    IronShore is obligated under the D&O Policy to pay attorneys' fees, costs, and other expenses that its insured, AllCare, incurs in the defense of the *Dameron Action*

77.    IronShore's duty and obligation to defend AllCare in the *CVMG Action* further includes the duty to reimburse Plaintiff for all the defense expenses it incurs in the *CVMG Action*.

78.    IronShore's duty and obligation to defend AllCare in the *CVMG Action* further includes the duty to reimburse Plaintiff for all the defense expenses it incurs in the *Dameron Action*.

79.    IronShore has not paid any of KGF's defense invoices since the dates of tender.

80.    IronShore has breached its duty to defend the Plaintiffs in the *CVMG and Dameron Actions*.

81.    As a result of the breach, AllCare incurred and continues to incur defense

expenses in defending against the *CVMG and Dameron Actions* and other damages.

## THIRD CAUSE OF ACTION

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

82.     Plaintiff, by this reference, incorporates each and every allegation set forth in the above paragraphs of this Complaint as though fully alleged herein.

83.     Valid contracts exist between AllCare and IronShore, namely, the Policies.

84.     By issuing and delivering the Policies and taking payments from AllCare, IronShore agreed to provide a defense for suits seeking damages for "wrongful acts" as defined in the Policies.

85.     The *CVMG and Dameron Actions* allege facts implicating coverage under the Policies as "wrongful acts", thereby triggering IronShore's obligation to defend its insured, AllCare, in the *CVMG and Dameron Actions*.

86.     No exclusions would bar IronShore from defending AllCare in the *CVMG and Dameron Actions*.

87.     IronShore has acknowledged the potential for coverage and that it has an obligation to defend AllCare in the *CVMG and Dameron Actions*.

88.     IronShore is obligated under the Policies to pay attorneys' fees, costs, and other expenses that its insured, AllCare, incurs in the defense of the *CVMG and Dameron Actions.*

89.     An implied duty of good faith and fair dealing is implicit in every contract, including insurance contracts.

90.     IronShore unreasonably failed to provide policy benefits, namely the payment of reasonable defense expenses as incurred and according to its repeated promises.

91.     IronShore has unreasonably refused without good cause to pay for any of KGF's defense invoices.

92.     IronShore, despite repeated requests from AllCare to pay defense

expenses and providing copious information regarding its breach, has continued failing to make any defense payments.

93.     IronShore's actions have been unreasonable and a breach of its implied covenant of good faith and fair dealing with its insured.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Independent Physicians Associates Medical Group, Inc, d/b/a AllCare IPA prays for judgment against Defendant IronShore Specialty Insurance Company.  as follows:

1.     A judicial declaration that Defendant IronShore has a duty to defend AllCare in the underlying actions styled as *Central Valley Medical Group, Inc., v. Independent Physicians Associates Medical Group, Inc,* Superior Court, Stanislaus County, California, Case No. CV-19-001652 (the "*CVMG Action*") and *Dameron Hospital v.  Independent Physicians Associates Medical Group, Inc,* Superior Court, San Joaquin County, California, Case No.  STK-CV-UBC-21019-13963  (the "*Dameron Action*");

2.     A judicial declaration that IronShore must timely and promptly reimburse AllCare for all the reasonable defense expenses incurred and will incur in the defense of the *CVMG Action* and the *Dameron Action* paid on a monthly basis, plus prejudgment interest from the date of each invoice at the statutory interest rate;

3.     A determination that IronShore has breached its contract obligation to defend its insured, AllCare, in the *CVMG Action* and in the *Dameron Action;*

4.     An award of damages against IronShore for its breach of the Policy contracts;

5.     A determination that IronShore has breached its implied covenant of good faith and fair dealing;

6.     An award of damages against IronShore for its breach of its covenant of good faith and fair dealing;

7.     An award of AllCare's reasonable attorneys' fees incurred in this lawsuit;

8.     An award of the costs of this suit; and

9.     For such other and further relief as this Court may deem just and proper.

Dated:  May 21, 2020                    **GAUNTLETT & ASSOCIATES**


By:_____/s/ James A. Lowe_____
David A. Gauntlett
James A. Lowe

Attorneys for Plaintiff
Independent Physicians Associates
Medical Group, Inc.


## DEMAND FOR JURY TRIAL

AllCare demands a trial by jury on all issues subject to jury determination.


Dated:  May 21, 2020                    **GAUNTLETT & ASSOCIATES**


By:_____/s/ James A. Lowe_____
David A. Gauntlett
James A. Lowe

Attorneys for Plaintiff
Independent Physicians Associates
Medical Group, Inc.

258445_7.doc                                                COMPLAINT